HENRY BLUM, Respondent, *v.* THE MANHATTAN LIFE INSURANCE COMPANY, Appellant.

First Department, May 5, 1939.

*John J. Cunneen* of counsel [*Ross, Dodge & Miller,* attorneys], for the appellant.

*Bernhardt M. Meisels* of counsel [*James M. Fawcett*], for the respondent.

DORE, J. Plaintiff, a physician, brought this action to recover $6,000, the claimed reasonable value of services rendered by him to defendant at defendant's alleged request in procuring for defendant certain medical data and information relating to a claim on a $50,000 policy of life insurance issued by defendant on the life of one Frank L. Goetz. Defendant, alleging plaintiff was employed by Ralph E. Nesbit & Co., a professional investigating company, admittedly hired by defendant to investigate the claim, denied the contract of employment and also denied plaintiff's performance. All issues were submitted to the jury as issues of fact; the jury returned a verdict in plaintiff's favor for $1,200; defendant appeals.

We will assume there was evidence sufficient to support the claim that plaintiff was employed by defendant and not by Nesbit. Nevertheless we think that the judgment entered on the jury's verdict must be reversed and the complaint dismissed on the ground that on one essential aspect of plaintiff's case, his faithful performance of the duty he contracted to perform, the jury's verdict may not stand as it is contrary to the evidence adduced by plaintiff himself.

According to plaintiff's testimony he was hired to do the investigating on December 31, 1936, and immediately began the work; on January 5, 1937, he procured from a Dr. Abraham W. Ruskin a letter written in the handwriting of that physician stating that as a result of Dr. Blum's investigation of the case of Frank Goetz, the insured, Dr. Ruskin definitely admitted that he had treated the insured for a number of years for coronary heart disease, the treatment having been given as early as 1933, at which time he prescribed metaphylin and amytol (drugs prescribed for cardiac disease). Dr. Ruskin had known the insured for twelve years prior to his death, had signed the physician's statement in connection with the application for the $50,000 policy in May, 1935, and had also signed the death certificate, but had failed to include in either the fact that the insured had been treated by him for heart disease as early as 1933. The $50,000 policy was issued in May, 1935; the insured died of coronary thrombosis in November, 1936. In the application for the $50,000 policy in May, 1935, the insured had stated he had never suffered from any ailment or disease of the heart, was in good health and had not consulted any physician within five years preceding the application.

Plaintiff testified that he had been to Dr. Ruskin several times and the doctor at first stated he had never treated the insured for heart trouble. He also testified that by January 5, 1937, he had examined in various drugstores the originals of prescriptions prescribing the above specified drugs for the insured over a period of time long prior to the application for the policy, had made copies thereof and had these prescriptions in his possession on January 5, 1937. Plaintiff admitted that after said date he found nothing of importance and that the only thing of importance in his whole report was Dr. Ruskin's letter. Plaintiff also admitted that when he saw Mr. Ross, defendant's general counsel, on January 6, 1937, he knew he had that letter in his possession, told him all the things that he had done up to that date but did not tell him anything about the letter although the letter had been given to him absolutely by Dr. Ruskin without any conditions.

Nevertheless on January 6, 1937, at a conference between Mr. Nesbit, Mr. Ross, a Mr. Feeter, manager of defendant's claim department, and Dr. Blum, plaintiff told Ross in substance that there was certain additional information which he could get that would " break " the case but it would cost $5,000 to procure it. Plaintiff testified: " I told them that in going over their records I was confident a fraud had been committed, and I said I was fortunate in being able to have someone else give me leads to break this case, and I wanted their permission to promise an expenditure

of $5,000 to this other party for these leads." Plaintiff admitted that Mr. Ross characterized the proposal as "an outrage" and stated he "never heard of any such thing."

After the conference Nesbit wrote defendant a letter dated January 6, 1937, addressed to Mr. Ross, confirming "our conference of this morning at which Mr. Feeter and Dr. Blum were also present," and made in writing the proposal that if, as represented, "we are able to secure evidence sufficient for you to 'break' this case * * * you will reimburse us for our necessary expenditures, amounting to $5,000 as explained, plus a fee of $1,000 making a total of $6,000," and urged upon Ross the necessity of prompt action. On January 7, 1937, the defendant wrote that it "in no sense accepts the proposal made in your letter of January 6, 1937." On January 8, 1937, Nesbit wrote the company stating that Dr. Blum had refused to submit his report as requested and that under the circumstances he, Nesbit, withdrew from the case.

In our opinion the admitted suppression on January 6, 1937, of Dr. Ruskin's letter, the really important evidence discovered by Dr. Blum in his investigation, and the effort to secure $5,000 from the defendant to pay to someone to get the necessary information which Dr. Blum already had in his possession, was so serious a breach of the duty he owed his employer going to the very essence of the contract of employment that the jury's verdict in plaintiff's favor is contrary to the evidence.

Plaintiff concededly suppressed the essential evidence and information he was employed to procure and bound to reveal to his employer on January 6, 1937. Plaintiff testified: "Q. And you got that report from Dr. Ruskin on the 5th of January, 1937, didn't you? A. That's right. * * * Q. And up to that time, January 5, 1937, when you went to him and told him, you told him according to your report, didn't you, of these various prescriptions that you found containing metaphylin as the prescription, and you told him that, didn't you? A. That's right. Q. So that you had the prescriptions then, and you told him what was in the prescriptions, and finally you got from him this letter on January 5th, didn't you? A. That's right. * * * Q. And the only thing of importance in the whole thing was this letter of Dr. Ruskin's, wasn't it? A. That's right. * * * Q. And when you saw Mr. Ross on the 6th you knew you had that letter, didn't you? A. I did. * * * Q. You didn't tell him you had that letter, did you? A. No, I did not. Q. You went and told him all the things that you had done up to that time, I believe you stated on your direct examination, but you did not tell him about that letter which was the only important thing in the whole matter,

isn't that right? A. That's right, counselor. Q. Now, when you reported you stated in here about seeing Dr. Ruskin on how many occasions? A. Three times altogether. Q. Now, did you say anything in this report that Dr. Ruskin had given you that letter on any condition at all? A. I didn't say it in this report, and I don't imply it in this court. Q. The doctor gave it to you without any conditions at all, didn't he? A. Absolutely."

On redirect examination plaintiff testified: " Q. After you had a conversation with Mr. Ross on January the 6th, 1937, at which time you told him in substance that there was some additional information that would break this case which would cost $5,000, and subsequent to that conversation Mr. Ross refused to pay for that information, is that correct? A. That's right."

Plaintiff's witness Ralph E. Nesbit testified on cross-examination: " Q. That is the reason, what you have explained to the jury is the reason you put January 8th in there? A. Dr. Blum told them in the office that haste was imperative. Q. Haste was imperative? A. Yes. Q. And it had to be within 48 hours, didn't he so say? A. No, he didn't state definitely. He said it would be far better, however, to make up their minds quickly because something might happen to destroy the evidence he hoped to obtain."

Plaintiff not only clearly suppressed on January 6, 1937, the evidence and information that he had in his possession and that he was bound to reveal but he continued to do so, refused to make his report and in fact made no report until after January nineteenth, after he was told that defendant knew all about the case and after he had received a letter sent to him by Victor Ruskin, Esq., a New Jersey attorney, that defendant and Hooper-Holmes Bureau had been in communication with Dr. Ruskin on January nineteenth and Dr. Ruskin had told the entire story. On January 19, 1937, defendant procured a written statement from Dr. Ruskin admitting he had treated Goetz, the insured, for true coronary sclerosis as early as November, 1933, and that he had failed to include in the physician's certificate all of the information but gave substantially all the facts in his statement. Thereafter but not until January 26, 1937, the plaintiff delivered his report containing the essential information regarding Dr. Ruskin's treatments which defendant had theretofore procured. That report, consisting of seventy-nine pages, gave in great detail all of plaintiff's interviews with physicians and other persons in connection with the claim but did not give a single date on which any one of such persons were interviewed by plaintiff though it is obvious that such dates would be essential. Their omission was an equally obvious part of plaintiff's strategy to avoid admitting in writing what he was forced to admit in his testimony on the trial.

On direct examination plaintiff testified regarding the conference of January sixth as follows: " Mr. Ross then asked me what I had done to date. I told them of different interviews that I had had. I told them of the different people I had visited up until that time. I told them of two interviews I had with Dr. Ruskin; of the fact that Dr. Ruskin still denied having ever treated Mr. Goetz for heart disease, and still denied ever having knowledge of Mr. Goetz having heart disease." From the previously quoted testimony of the plaintiff it is clear that when he told defendant's representatives on January sixth that Dr. Ruskin " still denied " ever treating the insured for heart disease plaintiff then had in his possession Dr. Ruskin's admission, procured the day before, that he *had* treated the insured for heart disease as early as 1933. It is demonstrated, therefore, that the above-quoted representation plaintiff testified to making on January 6, 1937, was at the time false and fraudulent and was known to the plaintiff to be so.

The court charged the jury without exception or contrary request by plaintiff's counsel that plaintiff would have to prove that his performance did not deviate from the trust imposed upon him and was in no wise antagonistic to the interest of his employer, and that " The law will not countenance a servant turning on his master. The law will not permit anybody who has a contract to do something which is meretricious, to do something which is against the interests of another who is a party to the contract." The charge as made is the law of the case. In view of the evidence it is clear plaintiff himself established that his conduct violated the trust imposed upon him and was obviously antagonistic to the interest of his employer. Such treachery cannot be deemed performance; nor was it ratified by not returning the tardy report giving information the essentials of which the company already had procured through others.

It is true Dr. Blum testified that after January fifth he worked on the case and saw a few doctors but he admitted that he found nothing important. On the trial plaintiff left the jury and the court completely in the dark as to what the information was that the $5,000 was to be paid for if it was not the precise information already procured. On the record, therefore, it was the information Dr. Blum already had in his possession. Assuming, then, that plaintiff was employed by defendant, his unfaithfulness established by his own evidence shows such a violation of his contract of employment in a material and substantial matter going to its very essence as to bar any recovery.

The only reference in plaintiff's brief to the excerpts from the record that we have made is the statement: " Careful analysis

indicates that this alleged accusation is based on speculation and guess, since the plaintiff's testimony is equally consistent with the theory that plaintiff's conduct was proper and regular." But apart from that conclusory statement there is no analysis, careful or otherwise, of the testimony in question. It should be obvious that no analysis could show plaintiff's conduct was proper.

The verdict was clearly contrary to the evidence and to us it does not seem possible that this court can give its sanction to the acts and conduct of plaintiff on which the judgment appealed from is based.

The judgment in plaintiff's favor and the order should be reversed, with costs, and the complaint dismissed, with costs.

MARTIN, P. J., O'MALLEY, TOWNLEY and CALLAHAN, JJ., concur.

Judgment and order unanimously reversed, with costs, and the complaint dismissed, with costs.